GOODWORTH HOLDINGS
INC., Plaintiff,

v.

Dr. M.W. SUH and JPMorgan,
Hambrecht & Quist,
Defendants.

No. C 01–03130 WHA.

United States District Court,
N.D. California.

Oct. 23, 2002.

Order Denying Amendment
Dec. 20, 2002.

A. Charles Dell'Ario, A. Charles Dell'Ario, P.C., Oakland, CA, Samuel L. Boyd, Priscilla E. Perry, Boyd & Associates, Dallas, TX, for Goodworth Holdings, Inc.

Stephen D. Hibbard, Jason A. Yurasek, Deborah A. Adler, Bingham McCuthen LLP, San Francisco, CA, for JPMorgan Securities Inc.

William H.Y. Park, Linda K. Kim, Kwak, Kim & Park, Timothy J. Hughes, Daniels, Fine, Israel & Schonbuch, LLP, Los Angeles, CA, for M.W. Suh.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ALSUP, District Judge.

### INTRODUCTION

Plaintiff alleges that defendant Suh breached an oral joint-venture agreement by misappropriating the alleged venture's opportunity while telling plaintiff that the opportunity had gone sour. On summary judgment, this order holds that although plaintiff and Dr. Suh conducted preliminary negotiations regarding a joint venture, they never created a binding contract. No reasonable jury could find otherwise. Plaintiff's fraud and state securities claims also must fail because plaintiff cannot prove an essential element. Accordingly, summary judgment is **GRANTED** for defendants as to all claims.

### STATEMENT

At the heart of plaintiff's claims is the contention that plaintiff and defendant Suh formed an oral joint-venture agreement for the purpose of acquiring a majority share of the common stock issued by G & G Telecom, Inc (now called GNG Networks, Inc.), a Korean telecommunications corporation which was owned by Daehan Oil Pipeline Corporation ("DOPCO"). This order holds that although the parties engaged in preliminary negotiations, no agreement was ever reached because they had not determined essential terms. Thus Dr. Suh was free to communicate or even to contract with other parties.[1]

#### 1. THE PARTIES.

Plaintiff Goodworth Corporation was run by Chris Ainsworth, among others, in Texas. The now-defunct company's business was investment banking, asset man-

---

1. Plaintiff filed multiple declarations and affidavits by the same witness, incorporated seemingly every deposition and document in this case, and cross-incorporated each of its briefs and supporting declarations in support of its other motions. By doing so, plaintiff created a morass, evidently expecting the Court to sift through it in order to find a material issue of fact. The affidavits of Chris Ainsworth and Richard Ainsworth both are filled with conclusions, speculation and information for which the witnesses lack personal knowledge or which constitute blatant hearsay. Furthermore, Chris Ainsworth's affidavit

agement, and trading for hedge funds. During the time period at issue, Goodworth managed the assets of one account, Aberdeen Consulting. Aberdeen had an account with the brokerage firm of Hambrecht & Quist LLC ("H & Q") and Mr. Ainsworth was authorized to trade for that account (Ainsworth Dep. at 11–18, 144–46).

Dr. M.W. Suh is a Korean businessman whose background included work as a telecommunications consultant for Korean companies. Dr. Suh hoped to organize the acquisition of a controlling interest in G & G Telecom (now GNG Networks), a South Korean telecommunications company.

J.P. Morgan Securities Inc. is an investment banking subsidiary of J.P. Morgan Chase A Co., a financial services company incorporated under Delaware law J.P. Morgan is the successor by merger to the rights and obligations of H & Q.[2] At the time of the events at issue, H & Q was wholly-owned by H & Q California, which had a fifteen percent equity stake in a venture capital group, H & Q Asia Pacific ("H & Q AP").[3]

### 2. THE BUSINESS OPPORTUNITY.

GNG's largest shareholder, owning 26.2 percent of its equity, was the state-owned Korea Oil Pipeline Authority ("KOPA").

South Korea's Ministry of Industry ordered KOPA to divest its equity stake by the end of 1999. KOPA was developing a plan to sell its stake in accordance with the government's competitive-bidding procedures. Dr. Suh was aware of this, and believed that there might be a pre-emptive opportunity to buy KOPA's stake before it went to the public-bidding process. Dr. Suh hoped to become GNG's CEO following the government divestiture but did not have the funds to purchase the shares on his own.

Dr. Suh developed a business plan outlining his proposal. He wrote: "The acquisition strategy must be centered upon buying the KOPA-owned 26.2% block of shares-and carrying it out without getting entangled in the competitive bidding process." Dr. Suh hoped to offer no more than $7.00 a share and to use "the influence of the Ministry of Industry to circumvent the bidding process" (Chung Deel. Exh. 2 at 35–6). Thus, as Dr. Suh's counsel admitted at the hearing, Dr. Suh planned to bribe Korean government officials in order to get the deal done.

### 3. THE PARTIES' INTRODUCTION AND DISCUSSION OF THE BUSINESS OPPORTUNITY.

Dr. Suh was introduced to Mr. Ainsworth through a broker, John Norman.

includes arguments that were not plaintiff's raised in plaintiff's accompanying brief—leading the Court to infer that the affidavit was submitted to subvert page limitations. These shortcomings of plaintiff's briefs create an unfair situation, both for defendants and the Court. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001) (district court should not be forced to root through the record to identify a material issue of disputed fact not reasonably identified by plaintiff in opposition papers). This order nonetheless considered the admissible portions of the affidavits. The Court did not undertake to review all of the supporting material plaintiff submitted not cited in its briefs.

**2.** For ease of reference, this order refers to H & Q—and not to J.P. Morgan—not only when it describes the events that occurred, but also when it discusses the liability for defendant J.P. Morgan.

**3.** H & Q AP is not a party to this lawsuit. Goodworth filed a separate lawsuit against H & Q AP that has related to this action. Plaintiff argues that H & Q became an indirect owner of GNG stock by participating as a limited partner in the limited partnership of one of H & Q AP's funds that purchased GNG stock. Plaintiff has provided no evidence that H & Q had "control of the business" of the fund and no explanation as to why H & Q, a limited liability partner, should be liable. Cal Corp Code 15632.

The three met together in November 1998 near Dr. Suh's home in Monterey, California. During this meeting, Dr. Suh explained what he knew about GNG and the telecommunications industry in Korea (Ainsworth Dep. at 31–2). No deal was concluded between Mr. Ainsworth and Dr. Suh at this time (Ainsworth Decl. ¶ 16; Ainsworth Aff. (9–11–02) ¶¶ 8–9).

Following the November meeting, Dr. Suh and Mr. Ainsworth continued to discuss possibility of forming an acquisition vehicle to make a pre-emptive offer for KOPA's shares (Ainsworth Dep. at 33 4, 194). Mr. Ainsworth told Dr. Suh to write a proper business plan and Mr. Ainsworth described what it should contain (id. at 184–87).

Between late 1998 and early 1999, Mr. Ainsworth and Dr. Suh had telephone conversations. Goodworth characterizes these conversations as an agreement "to form a joint venture to seek the financial underwriting for the Stock Deal" (Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") ¶ 13). They discussed that they would pay their own expenses, participate equally 50–50 in any venture capital acquisition of GNG's trading block and ideally would receive twenty percent of the equity acquired by any venture capitalist group in GNG (Ainsworth Aff. (10–17–00) ¶ 5). Dr. Suh expressed that he wanted to become an officer of GNG, but Mr. Ainsworth said he could not guarantee that because it would be up to the investors (Ainsworth Dep. at 38). During one of their phone conversations, Dr. Suh said to Mr. Ainsworth something to the effect of "let's do it" or "that's good" (id. at 36). They agreed that they would work together and would not work with anyone else (id. at 233–34). They agreed

that Goodworth would help facilitate the transaction whether it introduced the money or whether Dr. Suh got the money on his own. Plaintiff would do this by providing legal counsel and helping Dr. Suh put his business plan together (id. at 42). Mr. Ainsworth stated that the joint venture was for a private acquisition of shares: "Obviously, we didn't want to get into a bidding war" and that part of the whole strategy was to avoid competitive bidding (id. at 75, 194). Dr. Suh denies that any such conversation and any such agreement occurred (Suh Dep. (1–22–01) at 128–32).

On February 4, 1999, Mr. Norman, the person who introduced the parties, and the Ainsworths entered into a memorandum of understanding as to how they would share any "profits achieved from arranging of the financing of this [GNG share] acquisition by Dr. Suh and his colleagues" (Hibbard Decl. Exh. 16). Dr. Suh was not a party to this agreement and was not made aware of this agreement. Around the same time, Goodworth put Dr. Suh in touch with its attorney. Joe Galda (Ainsworth Aff. (10–17–00) ¶ 8).[4] Mr. Ainsworth and Mr. Galda reviewed Dr. Suh's business plan and made comments on it (Ainsworth Dep. at 186–88; Galda Dep. (7–26–02) at 53–5).

Mr. Ainsworth knew some H & Q stockbrokers through his work for Aberdeen (Ainsworth Dep. at 158–59, 202–03). He asked one of them to put him in contact with an investment banker at H & Q, and was referred to Tim Baughman. Before having any substantive conversations with Mr. Baughman, Mr. Ainsworth requested that H & Q sign a non-disclosure or confidentiality agreement (id. at 163–64; Galda Dep. (7–26–02) at 108–09). Mr. Baughman

---

**4.** Mr. Galda represented Goodworth, and both parties agreed at bearing that Mr. Galda was not also an agent for Dr. Suh.

sent a signed confidentiality agreement on February 25, 1999 (Plaintiff's Motion Exh. A–CA4).

#### 4. THE EVENTS OF MARCH 1999.

On March 11, 1999, at Goodworth's request. Mr. Galda faxed a draft letter agreement and accompanying term sheet to Dr. Suh and Mr. Norman (Ainsworth Dep. at 107–08). According to the draft letter agreement, it and the term sheet contained "the basic terms under which [Goodworth, Suh and Norman] propose to make an investment in a company to be organized to acquire KOPA's shares." Among other things, the term sheet included a no-shop provision, under which the parties to the contract agreed "for a period of (90) calendar days" not to "seek or respond to any unsolicited offer or proposal for equity financing in GNG except with or to the Company pursuant to the terms hereof." *Significantly, the letter explicitly stated "This letter must be accepted by all of you by 5:00 P.S.T. on March 12, 1999 or it shall no longer be in effect"* (Hibbard Decl. Exh. 17 at GW 0358) (emphasis added).

Dr. Suh, Mr. Galda, Chris Ainsworth and Richard Ainsworth, Chris' father, had a conference call on March 12, to discuss the proposed term sheet (Ainsworth Dep. at 118; Galda Dep. (7–26–02) at 70–1). The testimony is opposed over the nature of the dispute that erupted during the call. The parties *do* agree, however, that there were disagreements, that the discussions broke down and that the term sheet was never executed (Ainsworth Dep. at 117, 179–81; Suh Dep. (1–22–01) at 160–61; Norman Dep. Vol. 1 at 124–25; Galda Dep. (7–26–02) at 86; Ainsworth Aff. (10–17–00) ¶ 11). Mr. Ainsworth claims Dr. Suh mentioned for the first time that "payments" to Korean government officials would be necessary to circumvent the competitive bid-

ding (Ainsworth Dep. at 126–28). Dr. Suh testified that there was disagreement as to Norman's role and involvement and as to the identification of parties and roles and who would absorb costs (Suh Dep. (1–22–01) at 140–43, 160). Mr. Ainsworth says that there was not a "dispute" on this point but, rather, there was a "discussion" (Ainsworth Dep. at 122), and his father, Richard Ainsworth, testified "I had a question on how we should be handling John Norman (Richard Ainsworth Dep. at 40)."

Mr. Norman's testimony as to what was disputed during the conference call is so far beyond the pale that no reasonable jury could accept it. Putting aside that Mr. Norman necessarily is biased by his share of any award to Goodworth herein (Norman Dep. Vol. I at 38–9). Mr. Norman's deposition corrections regarding the source of the parties' disagreements during the call indicate an intent to mislead the Court and the jury. In his deposition, he originally said that the negotiating parties did not have an understanding as to the roles each party would play (Norman Dep. Vol. I at 121). In his correction. Norman changed his answer to "We did have an understanding of what each other's role and responsibilities would initially incur, what deliverables needed to be produced and what the 'next steps' or action plan would be" (Kim Decl. Exh. C). At his deposition, Mr. Norman testified with regard to the call that he assumed they couldn't agree "on a financial arrangement between the two of them as to who was going to get what" (Norman Dep. Vol. I at 27). However, when he made his corrections, he changed many of his answers to say that they also could not agree as to "whether government officials would be paid" (Kim Decl. Exh. C). These corrections change night into day and are inadmissible. No reason was given for the 180–degree changes.

Plaintiff submitted no evidence that Dr. Suh subsequently agreed to the term sheet for the joint venture. On the day of the conference call, however, Mr. Galda faxed Mr. Baughman of H & Q a copy of Dr. Suh's business plan (Galda Dep. at 90–1). The accompanying memorandum falsely stated: "We [Goodworth] have entered into a term sheet with respect to a joint venture with Dr. M.W. Suh pursuant to which a newly formed company will negotiate to acquire initially the 26.3% ownership of GNG Telecom from the Korean Oil Pipeline Authority" (Hibbard Decl. Exh. 13). As noted above, the parties had not signed the term sheet or otherwise "entered into" it. Mr. Ainsworth testified that this fax was sent in the morning before the conference call, in anticipation that the parties would reach an agreement on the phone, and that the only reason it was not signed was because of the payment issue (Ainsworth Dep. at 126).[5] Mr. Galda does not recall doing any work for Goodworth on the GNG opportunity after the March 12 conference call (Galda Dep. (7–26–02) at 98).[6]

Mr. Baughman did not respond to the business plan that Mr. Galda had sent him, so Mr. Ainsworth contacted him. Two weeks later, Mr. Baughman said that H & Q was not interested in the proposal because H & Q "didn't do this type of deal" Mr. Baughman offered to refer the proposal to H & Q's Asia Pacific venture group (Ainsworth Dep. at 168–72). Mr. Ains-

worth on behalf of Goodworth consented only after Baughman assured him that the confidentiality agreement with Goodworth would prohibit the unauthorized use or disclosure of the GNG deal by an H & Q affiliate (Ainsworth Aff. (9–11–02) ¶¶ 10–15). A "week or two later." Mr. Ainsworth called Mr. Baughman and was told that H & Q AP had no interest (Ainsworth Dep. at 74, 171–72).[7]

In April, Mr. Ainsworth told Mr. Norman during a phone call when Mr. Norman was in Hong Kong that the parties were "unable to come to agreeable terms" (Norman Dep. Vol. I at 86–8). When he got back from Hong Kong. Mr. Norman told Dr. Suh that the H & Q funding would not occur. Dr. Suh then contacted GNG and advised that no funding was expected (Suh Dep. (7–22–02) at 78). During the same telephone call, Dr. Suh told Mr. Norman that the deal was dead because a Canadian group had locked up the KOPA shares (*id.* at 91–4; Suh Dep. (1–22–01) at 105–09; Suh Dep. (7–22–02) at 77–81).

### 5. PAMA ORGANIZES THE ACQUISITION OF KOPA'S GNG SHARES.

A couple of months then went by with no efforts regarding the proposed joint venture. In June or July of 1999, however, Suh again had contact with GNG, when GNG requested his assistance on an uncompensated basis with respect to the development of Internet strategies for GNG

---

**5.** Later, in his affidavit, Mr. Ainsworth claimed that the business plan was faxed after the conference call (Ainsworth Aff. (9–11–02) ¶ 16). Furthermore, the fax indicated that it was sent at 6:35 p.m. (Galda Dep. at 90–91.)

**6.** Six days after the conference call, however, someone in Mr. Galda's office faxed to Dr. Suh a confidentiality agreement for KOPA for Goodworth's acquisition of the GNG stock. Mr. Galda first testified that he did not recall Dr. Suh asking for this or working on it, but

that presumably it was faxed upon Dr. Suh's request (Galda Dep. (7–26–02) at 98–100). Later Mr. Galda testified that Dr. Suh said he would forward the agreement to KOPA (*id.* at 153–55).

**7.** Mr. Baughman recalls nothing specific about Goodworth or the GNG proposal, did not have any contacts at H & Q AP and does *not believe he had any contact with anyone at* H & Q AP (Baughman Dep. at 30–37, 52–54).

(Suh Dep. (7–22–02) at 83–5).[8] In August 1999, the competitive-bidding process for GNG's shares that Dr. Suh had hoped to circumvent was publicly announced (Chung Decl. ¶ 4, Exh. 1). The invitation for bids stated that KOPA sought to sell its GNG shares through open competitive bidding and set a September 17–28, 1999, period for bids (id. Exh. 1 at 00008–9).

In August 1999, Jinho Chung, the President and CEO of Acts Capital Management ("ACTS"), learned about the GNG public-bidding process. ACTS was the exclusive financial advisor to Prudential Asset Management Asia ("PAMA") (id. ¶¶ 1–2). In August 1999, Mr. Chung was introduced to Dr. Suh, whom he had never met before, through a mutual acquaintance, Richard Kim (id. ¶¶ 5–7). In September 1999, Mr. Chung recommended pursuing the GNG shares to Cliff Cheung, the president and chief executive officer of PAMA. He introduced Mr. Cheung to Dr. Suh, whom he had never met before (id. ¶¶ 8–10). That month, PAMA decided to pursue with ACTS' assistance the purchase of the GNG shares. From September through October 1999, ACTS assisted PAMA with due diligence in connection with the transaction. Mr. Chung of ACTS participated in the negotiation at meetings with PAMA and DOPCO personnel. H & Q AP was not a party to these negotiations (id. ¶¶ 11–3).

PAMA invited H & Q AP to join PAMA in purchasing the GNG shares. Dr. Suh forwarded his February 22, 1999, business plan to Mr. Chung of ACTS on September 9, 1999 (id. ¶ 15). Neither ACTS nor PAMA ever saw, used, or relied on Dr. Suh's earlier business plan in connection with the acquisition of GNG shares (ibid.). H & Q AP never communicated with H & Q about the GNG opportunity nor relied upon or used any information from H & Q in relation to the GNG opportunity (Lee Dep. at 33–7). ACTS never had any dealings or communications with anyone at H & Q (Chung Decl. ¶ 17).

As noted earlier, when PAMA and DOPCO were negotiating, H & Q AP was not a party to the negotiations (id. ¶¶ 13–4). H & Q AP's Jac Woo Lee became involved with PAMA through C.R. Cho of Choong-Ang Investments, who was working with PAMA on the deal. Mr. Lee was an acquaintance of Mr. Cho. In August or September 1999 at a party Mr. Cho mentioned that he was working with PAMA to acquire GNG shares (Lee Dep. at 38–41). Mr. Cho also mentioned Dr. Suh to Mr. Lee and suggested that Mr. Lee meet him (id. at 42–3). Mr. Lee of H & Q AP already had learned of the GNG investment opportunity in June or July of 1999 through one of his investment officers, Tai Gon Kim. Mr. Kim had told Mr. Lee that the information concerning the investment possibility in GNG came from Good Morning Securities (id. at 28–30, 40–2, 76). Mr. Lee indicated that he would meet with Dr. Suh if it would help H & Q AP understand GNG (id. at 42–3).

---

8. This order views with great skepticism the credibility of Dr. Suh. The parties could not come to terms regarding the potential joint venture at the heart of this case because the Ainsworths refused to agree to pay bribes to Korean government officials in order to obtain the GNG shares. Furthermore, because of the indicia of falsity that Dr. Suh demonstrated in providing his deposition testimony, this order does not rely on Dr. Suh's testimony unless it is clearly uncontroverted by the cited testimony of other witnesses. At his deposition, Dr. Suh vehemently denied that he had signed a "secret agreement" with PAMA. When plaintiff's counsel finally produced the document for him, however, Dr. Suh admitted to having signed the document (Suh Dep. (7–22–01) at 97–100, 104–07). This dictum is not directly relevant on summary judgment, for this plaintiff every reasonable fact inference that the summary judgment record will allow.

Thereafter, Mr. Lee and others at H & Q AP met with Mr. Cho and Dr. Suh Dr. Suh was not acting as an investor but, rather, "was a kind of a potential manager and also introduction, some person introducing the deal to the investor group" (*id.* at 47–8). Mr. Lee of H & Q AP testified that he never received any written materials from Dr. Suh during the meetings within H & Q AP or the ones with Mr. Cho. Rather, Dr. Suh made oral representations on a white board, and Mr. Lee does not remember seeing Dr. Suh's business plan (*id.* at 43–5). Mr. Lee and his co-managing director Peter Ko made the recommendation to H & Q AP's investment committee to purchase GNG stock with the consortium.

The consortium was successful in acquiring the shares through the public-bidding process, and paid $16 per share (Suh Dep. (7–22–02) at 187–8). Dr. Suh obtained no equity in the transaction. Following the acquisition of the GNG shares, Dr. Suh was named CEO of the renamed GNG Networks (*id.* at 30–3).

### 6. PROCEDURAL HISTORY OF THIS LAWSUIT.

Goodworth filed this complaint in the United States District Court for the Northern District of Texas. The case was transferred to the Northern District of California in August 2001. On September 12, 2002, Plaintiff Goodworth moved for partial summary judgment as to its claims against both defendants for breach of contract, including failure to deal fairly and in good faith, breach of fiduciary duty, misrepresentation and deceit and violations of the securities anti-fraud provisions of the Texas Securities Act and the California Corporations Code. On the same day, both defendants separately moved for summary judgment claiming that Goodworth failed to raise a triable issue of material fact as to one or more elements of each of its claim's essential elements.

### ANALYSIS

#### 1. LEGAL STANDARD FOR SUMMARY JUDGMENT.

Summary judgment shall be rendered if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FRCP 56(c). Summary judgment is not granted if the dispute about a material fact is "genuine" -that is, if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The evidence, and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

The moving party "has both the initial burden of production and ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000). "Credibility determinations, weighing evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for directed verdict; evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. While all inferences must be resolved in favor of the nonmoving party, inferences cannot be drawn from broad generalities. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

On a motion by the party without the burden of proof at trial, the party may carry its initial burden by either of two methods. "The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1106. Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). Summary judgment for a defendant is appropriate when plaintiff fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548.

## 2. PLAINTIFF HAS PROVIDED INSUFFICIENT EVIDENCE OF THE EXISTENCE OF A JOINT-VENTURE AGREEMENT.

All three parties have moved for summary judgment on Goodworth's claim that Dr. Suh breached their joint venture agreement and H & Q committed tortuous interference with the agreement. This order grants summary judgment to defendants because there is no material question of fact as to whether a joint venture contract was formed.

Goodworth claims that by the end of 1998 or the first part of 1999. Dr. Suh and Mr. Ainsworth orally agreed to form a joint venture to seek the financial underwriting for a GNG-stock deal. It alleges that this joint venture was formed to get the transaction for GNG shares done in any way through a private transaction-not necessarily by privately acquiring the KOPA Stock using the influence of Korean officials. Goodworth claims that Dr. Suh's business plan, the term sheet and the March 12 conference call all outlined one possible way to structure the transaction-through a lock-up of the KOPA shares, but that the joint venture was more broadly defined.

On defendants' motion for summary judgment, this order must resolve all reasonable inferences in favor of plaintiff. According to Mr. Ainsworth's conclusory argument, he and Dr. Suh orally agreed to form a joint venture. They agreed that they would pay their own expenses, each would have a 50–50 stake, each would like to receive twenty percent of the equity acquired, and the parties were not allowed to work with anyone else.

A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. *Weiner v. Fleischman*, 54 Cal.3d 476, 482, 286 Cal.Rptr. 40, 816 P.2d 892 (1991). A joint venture *can* be created orally. *Ibid.* Under California law, a joint venture exists if there is an agreement between the parties under which they have a "joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." *Connor v. Great W. Sav. Loan Ass'n*, 69 Cal.2d 850, 863, 73 Cal.Rptr. 369, 447 P.2d 609 (1968). A legally binding agreement, however, is not formed where essential elements are reserved for future agreement. *Louis Lesser Enterprises, Ltd. v. Roeder*, 209 Cal.App.2d 401, 408, 25 Cal.Rptr. 917 (1962).

Here, Mr. Ainsworth repeatedly asserts that he and Dr. Suh had entered into a joint venture. Major, fundamental, essential terms of their agreement, however,

were clearly undecided. Mr. Ainsworth admitted to such: "how we were going to structure the deal" or "how to structure the acquisition of the shares" were not determined (Ainsworth Dep. Vol. 2 at 121, 176). The fact that Mr. Ainsworth and Dr. Suh may have orally agreed to certain essential terms does not mean that a binding contract ensued. *Louis Lesser*, 209 Cal.App.2d at 408, 25 Cal.Rptr. 917. Their preliminary agreements were mere preliminary negotiations that may or may not have wound up leading to a final offer. At most, it appears that Dr. Suh and Mr. Ainsworth created an agreement to agree, whereby they each expressed interest in developing an opportunity to privately obtain the GNG shares. Under California law, however, such an agreement does not create a binding contract. *Copeland v. Baskin Robbins U.S.A.* 96 Cal.App.4th 1251, 117 Cal.Rptr.2d 875 (2002).

Here, Goodworth did ultimately make an offer by providing Dr. Suh its term sheet, appended to this order for ease of reference. The term sheet clearly shows that Goodworth understood that the parties had not determined crucial issues. The term sheet indicates that the division of profits, who the parties to the agreement would be, and what role each party would

play in the transaction was not determined. John Norman's name is included in brackets, and the fifty percent ownership of Dr. Suh and Goodworth is in brackets, indicating that such terms were unresolved.[9] This alone is dispositive.

Furthermore, Mr. Galda admitted that the March term sheet was created as "a framework for the agreements" between Dr. Suh and Goodworth. He admitted: "The Term sheet constituted—I mean in basic contracts the term sheet constituted an offer which if it was accepted by the expiration time would govern their relationship among themselves" (Galda Dep. at 65 7, 81 2).[10]

Goodworth claims that the March term sheet did not refer to creating the whole joint venture, but merely described one way to structure the transaction. It claims that the joint venture's goal was to acquire GNG shares privately, but that the proposed acquisition strategy that the March term sheet contemplated was acquiring KOPA's shares. No reasonable jury could so find. In November 1998, before they allegedly formed the joint venture. Mr. Ainsworth told Dr. Suh to write a proper business plan for the contemplat-

---

9. No jury could find that Goodworth and Dr. Suh decided to split the profits 50–50. It is unbelievable that Dr. Suh would have agreed to such, given what Goodworth claims it was going to contribute to the joint venture. By plaintiff's own admission, Goodworth had completed its performance under the contract when it had introduced Dr. Suh to a qualified investment banker (Ainsworth Aff. (10–17–00) ¶ 9). No reasonable jury would belive that Dr. Suh would have given half of his profit to Goodworth merely because, as plaintiff's counsel stated at the bearing, it knew how to write a business plan and provided access to its attorney.

10. Goodworth argues that the evidence shows that an agreement already existed prior to its sending the proposed term sheet. Goodworth

points to the language of the cover sheet to the term sheet sent to Dr. Suh in preparation for the March 12 conference call. It said "attached to this memo [is] a draft term sheet with respect to our joint venture to acquire an interest in GNG Telecom." Goodworth also points to Mr. Galda's fax to H & Q following the conference call on March 12. It referred to a "term sheet with respect to a joint venture with Dr. M.W. Suh pursuant to which a newly formed company will negotiate to acquire ...." Goodworth also claims that Dr. Suh's failure to complain about these documents is further evidence that a joint venture existed. The cited language, however, does not indicate whether or not a joint venture already had been established (as opposed to one they had agreed to try to form).

ed transaction. Dr. Suh's business plan in its final form from February 22, 1999, states, "The acquisition strategy must be centered upon buying the KOPA-owned 26.2% block of shares as quickly as possible" (Chung Decl. Exh. 2 at 4). Thus, clearly the strategy of acquiring KOPA's shares already was contemplated by the parties in their discussions of the potential joint venture. At one point in his deposition, Mr. Ainsworth claimed that the term sheet was different from the original joint venture (and Dr. Suh's business plan) because it discussed setting up a holding company in Korea to buy the shares (Ainsworth Dep. at 260–62). No reasonable jury could find, however, that the term sheet referred to a separate agreement dealing with a holding company and not the joint venture itself.[11]

■ Additionally, under the law, when it is clear that both parties contemplate that acceptance of a contract's terms would be signified in writing, the failure to sign the agreement means that no binding contract is created. *Banner Entertainment, Inc. v. Superior Court,* 62 Cal.App.4th 348, 358, 72 Cal.Rptr.2d 598 (1998). Whether it was the parties' mutual intention that their oral agreement to the terms contained in a proposed written agreement should be binding immediately upon the oral agreement is to be determined by the surrounding facts and circumstances. *Ibid.*

■ Here, the evidence shows that Goodworth intended that the terms of its business relationship with Dr. Suh would be set forth in writing, and that no such document was ever signed. Goodworth's own term sheet itself evidenced that it was an offer by Goodworth to create a relation-

ship amongst the parties. *It even had a drop-dead—a date after which Goodworth's offer to Dr. Suh would expire.* When the parties did not execute the term sheet by that date, March 12, 1999, the offer expired and no contract was formed. The term sheet also included a no-shop provision which held that if the parties executed the term sheet, they could not seek or respond to any unsolicited offer or proposal for GNG financing for ninety days. This provision was inconsistent with the notion that the parties had already bound themselves to each other in a joint venture.

Furthermore, in determining whether a party did not intend to be bound until a formal document was executed, custom may be decisive. CORBIN ON CONTRACTS § 2.9 (Perillo, ed.1993). When Goodworth wanted to establish an agreement with Norman to share profits from the GNG opportunity, it entered into a written contract (Hibbard Decl. Exh. 16). When Goodworth contemplated forwarding the Business Plan to H & Q, it insisted on a written non-disclosure agreement (Plaintiff's Motion Exh. A–CA4). When Goodworth wanted to formalize its relationship with Dr. Suh, it sent its proposed term sheet (Hibbard Decl. Exh. 17).

In short, the two men had a lot of conversations about putting a deal together, but when it finally came down to determining the material terms of the relationship and the transaction in order to put them into writing, both parties walked away. No reasonable jury could determine otherwise.

\* \* \* \* \* \*

---

11. Goodworth also contradicts itself regarding what business transaction the alleged joint venture contemplated. At most times, Mr. Ainsworth claims that the alleged joint venture was to acquire the shares privately.

At other times, however, Mr. Ainsworth says that the joint venture was not restricted to a private deal, but that Goodworth was open to conducting the transaction through the public-bidding process.

Furthermore, even assuming *arguendo* that a jury issue existed over whether there was a joint-venture agreement, plaintiff's contract claims must still fail. Plaintiff cannot prove any damage as a result of Dr. Suh's breach of their purported exclusive joint venture relationship with a reasonable certainty. Any damages plaintiff has requested are speculative and fail as a matter of law. *Lueter v. State of California*, 94 Cal.App.4th 1285, 115 Cal. Rptr.2d 68 (2002) (where proximately-caused injury is not proven with reasonable certainty, plaintiff cannot recover).

Goodworth's contract claim requests damages for what it would have received if it had entered into a transaction to acquire the KOPA shares. There is no evidence, however, that the transaction that *did take* place had any roots in an opportunity that had belonged to the purported joint venture. The transaction for the acquisition of the GNG shares in which H & Q AP was involved occurred through the government's public-bidding process.[12] This transaction by which KOPA divested its GNG shares bore no resemblance to the intended private sale for which Goodworth claims the purported joint venture was formed. It is undisputed that the potential joint venture contemplated acquiring the shares by private sale. Mr. Ainsworth admitted that the discussions were for the private acquisition of the KOPA shares (Ainsworth Dep. at 74). When asked if Mr. Galda had any discussions with Dr. Suh about acquiring the KOPA shares by way of a competitive bid, Galda responded:

"That was definitely not the plan" (Galda Dep. (7–26–02) at 152). It is also undisputed that Dr. Suh identified the opportunity to acquire GNG shares before either Goodworth or Norman was involved, and that Dr. Suh did all of the research and wrote the business plan contemplating a private transaction. Moreover, it is undisputed that Dr. Suh never acquired any shares of GNG either directly or beneficially—he became an employee and received shares as compensation.

Goodworth cannot show that it would have reached an agreement with an investor and been able to bid for the acquisition of the GNG shares. Goodworth admits that it was very unlikely that any investor would have accepted the deal outlined in Goodworth's term sheet of March 1999:

> [We] didn't have the capital and we didn't have the funding. Our wish list was the term sheet. We did not—you know, we were hoping to get a deal done like that. The odds of us getting a deal done like that—the odds of JPMorgan funding us that way and giving us control of it, was very unlikely. But that was our wish list.

(Ainsworth Dep. at 26). Goodworth has provided no evidentiary support for calculating any possible damages.

**3. THERE IS NO TRIABLE ISSUE OF FACT AS TO WHETHER DR. SUH BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING.**

Plaintiff's claim for breach of the duty of good faith and fair dealing relies on its

---

**12.** Goodworth argues that even though the bid was not technically a private sale, there was bid process. Instead, the purchasers combined to submit a single contract to the government for the KOPA stock. Even if Goodworth is correct that defendants cannot identify a competitive bid that was submitted, that would not negate the fact that the purchasers went through the public bidding process. Goodworth's request for judicial notice of the "manipulative affect" of allowing purchasers to combine, rather than compete for the purchase of government investments in G & G stock is off base (Goodworth's Rep. at 5). Under FRE 201(b), a court cannot take judicial notice of a fact that is subject to reasonable dispute.

assertion that Dr. Suh was in a fiduciary relationship with Goodworth by virtue of their joint-venture agreement. Because this order determined that there was no contract formed for a joint venture as a matter of law, it follows that there was no attendant duty of good faith and fair dealing.

### 4. THERE IS NO TRIABLE ISSUE OF FACT AS TO DR. SUH'S OR H & Q'S ALLEGED BREACH OF FIDUCIARY DUTY.

Goodworth's complaint as well as its motion for summary judgment make clear that the alleged fiduciary duty of Dr. Suh is a result of the joint venture (Compl. ¶ 24; Plaintiff's Motion ¶¶ 32, 38). Because this order determined that there was no contract formed for a joint venture as a matter of law, it follows that there was no attendant fiduciary duty on the part of Dr. Suh.

▌ With regard to H & Q. Goodworth argues that a fiduciary duty existed by virtue of its existing client relationship with the brokerage and the non-disclosure/non-circumvention agreement signed in connection with the joint venture (Plaintiff's Motion ¶¶ 39–45). *First,* Goodworth's claim that a fiduciary relationship existed by virtue of the confidentiality agreement fails as a matter of law. Goodworth notes that Singhal, Dr. Suh's expert, testified that the provision of such an agreement to "deal referral sources" (as Goodworth would be considered since it was referring Dr. Suh's deal idea to H & Q) would create a relationship of trust and confidence (Singhal Dep. at 32–5). A fiduciary relationship, however, does not arise simply because parties repose trust and confidence in each other. *City Solutions, Inc. v. Clear Channel Communs., Inc.,* 201 F.Supp.2d 1035, 1048 (N.D.Cal.2002). A confidentiality agreement does not give rise to a fiduciary relationship unless it

does so expressly. *Trumpet Vine Invs. N. v. Union Capital Partners I, Inc.,* 92 F.3d 1110, 1117 (11th Cir.1996) (finding that nondisclosure agreement was not enough proof of a confidential relationship to avoid summary judgment). Here, the confidentiality agreement did not include any term conferring a fiduciary relationship.

▌ Goodworth also points to the fact that it managed a large hedge fund account at H & Q and was the sole point of contact and the trading party. Mr. Huebschle, Goodworth's account executive at H & Q, referred to Goodworth as a "client" (Goodworth's Response Opposition to Defendants' Motions for Summary Judgment Exh. M at JPHQ 0223 ("Goodworth's Opp.")). The fiduciary relationship. Goodworth argues, extended through Goodworth's client for whom H & Q traded shares, and also extended to the client's agent, Goodworth. *Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal.App.2d 690, 69 Cal.Rptr. 222 (1968) (the "relationship between broker and principal is fiduciary in nature and imposes on the broker the duty of acting in the highest good faith toward the principal"). H & Q argues that its legal duties were to Aberdeen only and it had no fiduciary duty to Goodworth.

▌ The "essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." *City Solutions,* 201 F.Supp.2d at 1049. Here, there is no evidence that H & Q exerted any influence or control over Goodworth. The parties interacted as equals and with "eyes wide open." Thus, this order finds that H & Q did not owe a fiduciary duty to Goodworth and Good-

worth's claims based on such are dismissed.

5. **PLAINTIFF HAS PRODUCED NO TRIABLE ISSUE OF FACT AS TO DR. SUH'S ALLEGED FRAUD.**

 Goodworth's fraud claim is centered around Dr. Suh's representations to Goodworth (through Mr. Norman) that a Canadian group had made a bid for the DOPCO shares sometime in March or April of 1999 and that such bid effectively would lock out any other opportunities to acquire the DOPCO held GNG shares through a private sale. This order holds that Goodworth has submitted no evidence from which a reasonable jury could conclude that Dr. Suh believed the representation was false and that he had the required scienter.

In early April 1999, Dr. Suh told Norman that the GNG stock deal was dead, and that Goodworth should not contact any other investment banking organizations to support the GNG stock deal (Suh Dep. (7–22–02) at 79–82). Goodworth argues that Dr. Suh committed a subversive business practice in that he did his best to completely discourage Goodworth from seeking any other investment banking group's involvement by reporting the Canadian "lock-up" This evidence goes to Dr. Suh's intent to defraud, a required element of the fraud cause of action.

Goodworth's evidence demonstrating that Dr. Suh intended to mislead it, however, is most scarce. Goodworth argues that when Dr. Suh said the deal was dead, it was not dead, and that Dr. Suh was involved as an advisor to PAMA and the primary consultant promoting the GNG stock deal to H & Q AP (Plaintiff's Motion Exh. O; Goodworth's Opp. ¶ 16). Goodworth, however, offers *no evidence* in support of this contention. Goodworth makes base allegations and conclusory inferences that Dr. Suh utilized Goodworth's reference to H & Q AP in creating the ultimately-successful public bid, and that he lied when he told them about the Canadian deal to cut them out of the picture.

Goodworth merely points to the fact that H & Q AP, which allegedly was given Dr. Suh's business plan through Goodworth in April 1999, eventually wound up involved in the public-bidding process. Goodworth alleges that Dr. Suh's participation was so critical to H & Q AP that he was introduced and made the GNG stock deal presentation to the chairman of H & Q AP (Lee Dep. at 58–9). Dr. Suh, however, testified that he was nothing more than an Internet consultant for GNG until on or about November 26, 1999, when he learned that some consortium was going to make a stock purchase of GNG stock, the consortium that ultimately won the public bid. (Suh Dep. (07–22–02) at 85–90). Dr. Suh *did* present his business plan to acts, which was working with H & Q AP, but this occurred in September 1999 (Chung Decl. ¶ 15). Thus, it is no "zinger," as plaintiff alleges, that Dr. Suh admitted that presentation of his business plan to H & Q AP was "ultimately successful" (Suh Dep. (1–22–01) at 126–27). In light of the undisputed evidence presented by defendants explaining how H & Q AP came into contact with Dr. Suh, and that his business plan was not reviewed or used, no reasonable jury could find that plaintiff established Dr. Suh's intent.

6. **THERE IS NO TRIABLE ISSUE OF FACT AS TO H & Q'S ALLEGED FRAUD.**

 Plaintiff alleges that H & Q is liable for fraud because its Mr. Baughman, falsely asserted that H & Q AP had no

interest in the KOPA deal.[13] Plaintiff has put forth no evidence, direct or circumstantial, demonstrating that Mr. Baughman knew that statement to be false, or that H & Q AP actually had an interest in April 1999. The only evidence in the record shows that H & Q AP's interest began months later, following PAMA's invitation to H & Q AP's subsidiary, H & Q AP Kerea, to join the consortium. Furthermore, Goodworth has put forth no evidence indicating that Mr. Baughman spoke with fraudulent intent. Accordingly, summary judgment is granted as to defendant H & Q on this claim.

### 7. PLAINTIFF HAS NOT STATED A CLAIM FOR A SECURITIES LAW VIOLATION.

Although Goodworth's complaint did not include allegations under California securities law, Goodworth moves for summary judgment under both California and Texas securities law.[14] Goodworth requests that the Court choose whichever state law is more advantageous to Goodworth: "Goodworth should be entitled to recover under the state statute that best make [sic] it whole, as Defendants violated both Texas' and California's securities laws" (Goodworth Rep. ¶ 44). Additionally, Mr. Ainsworth's declaration asserts that Texas securities law applies, but that California securities law "may also apply" (Ainsworth Decl. ¶¶ 10, 12).

■ A district court sitting in diversity is not charged with determining which state law which would be more strategic

for a party and then applying that law. Under *Abogados v. AT & T*, 223 F.3d 932, 934 (9th Cir.2000), the district court applies a "governmental interest" analysis to determine the choice of law. *First*, the court examines the substantive law of each jurisdiction to determine whether the laws differ as applied to the relevant transaction. *Ibid.* Here, plaintiff has not made a showing that Texas securities law differs from California law. In fact, in its "Supplemental Zingers Post–Hearing Supplements," plaintiff alleges that both of the states securities laws are the same. Accordingly, this order will apply California state securities law.

■ Section 25400(d) of the California Corporations Code proscribes false and misleading statements made for the "purpose of inducing the purchase or sale" of securities. This cause of action requires the plaintiff to prove that the perpetrator had specific intent to affect the price of a security in order to induce its purchase or sale. *California Amplifier v. RLI Ins. Co.* 94 Cal.App.4th 102, 109–10, 113 Cal. Rptr.2d 915 (2001). As noted above, this order holds that plaintiff has failed to demonstrate that either defendant is liable for any misleading statements because plaintiff has failed to provide any evidence supporting the element of intent.

To state a claim under Section 25401, plaintiff must allege that there was an "offer to sell a security in this state or buy or offer to buy a security." [15] Plaintiff has

---

**13.** Because this order holds that plaintiffs have not provided enough evidence to demonstrate fraud on the part of Mr. Baughman, it does not reach the issue of whether H & Q would be responsible for his actions.

**14.** Dr. Suh's motion for summary judgment did not move for a ruling on California securities law because Goodworth's complaint did not allege violations of California securities law.

**15.** Goodworth notes in his "Supplemental Zingers Post–Hearing Supplements" that a "contract for the purchase or sale" of securities is a "purchase or sale" of securities for purposes of securities laws. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 751, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) It claims that there are "two (2) separate related contracts for the purchase or sale of securities" at issue in this case: the term sheet and

not alleged that either defendant made a sale or purchase of stock or an offer to do so (Ainsworth Dep. at 249) Finally, section 25401 requires plaintiff to demonstrated privity with each defendant. Because this order found that no contract existed between Goodworth and either defendant, plaintiff had failed to demonstrate this privity element. Accordingly, its claims for breach of securities law are dismissed.

## CONCLUSION

For the reasons stated above, defendants' motions for summary judgment are **GRANTED** in their entirety.

**IT IS SO ORDERED.**

### DEPOSITION EXHIBIT 3

### MEMORANDUM

To: Dr. M.W. Suh

From: Joseph P. Galda

Date: March 11, 1999

Subject: Term Sheet

Please find attached to this memo a draft term sheet with respect to our joint venture to acquire an interest in GNG Telecom. Obviously there are a number of issues which need to be addressed and we would like to schedule a conference call with you for 11:00 A.M. Eastern time (8:00 your time and 10:00 Chris' time) to discuss the salient points with the idea that we would be in a position to sign off on the term sheet by tomorrow. Please let me know if this is convenient and the number that you would like to be reached at for this meeting.

Also, we would like to send a presentation to Hambrecht & Quist and Bankers' Trust Corporation. We would contemplate a cover letter identifying the opportunity together with the latest draft of the business plan. Please let us know your thoughts on this. We have received several inquires from Hambrecht & Quist regarding our progress on this matter and we feel that it is important to get something in their hands by Friday.

[dated March ___, 1999]

Dr. M.W. Suh

[John Norman]

Re: Formation of Company, (the "Company") by GoodWorth Holdings, Inc. ("GoodWorth"), Dr. M.W. Suh ("Suh") and John Norman ("Norman") (collectively, the "Organizers") to Acquire Shares of GNG Telecom Inc. ("GNG")

Dear Sirs:

This letter, and the attached Term Sheet (which is a part hereof), contains the basic terms under which the Organizers propose to make an investment in the Company. Please note the "Conditions to Closing" section of the Term Sheet.

The Organizers' willingness to enter into the transactions described in the term sheet is subject to (1) an agreement on the part of the Korean Oil Pipeline Authority ("KOPA") to sell shares of GNG representing approximately 26.2% of the outstanding shares of GNG (the "Shares"), on a fully diluted basis, together will all rights to management representation associated with the Shares (2) due diligence, the scope and results which are acceptable to the Organizers, (3) the absence of any

Goodworth's referral of the GNG Stock Deal to H & Q. Contrary to plaintiff's assertion, however, there is no contract for the purchase of securities at issue here. *First*, no joint venture ever was formed and the term sheet was never entered into *Second* the "referral"

did not create a contract for the purchase of securities both H & Q and H & Q AP, according to plaintiff's evidence, rejected plaintiff's referred offer and said that they were not interested.

material adverse change in the business of GNG and (4) the execution and delivery of documentation relating to all transactions contemplated herein which is acceptable to the Organizers. The Term Sheet does not contain all of the terms of the Investor's proposed investment or all of the conditions precedent to such an investment.

This letter must be accepted by all of you by 5:00 P.S.T. on March 12, 1999 or it shall no longer be in effect.

In consideration of the Organizers' willingness to consider the transaction described herein and their willingness to engage in further due diligence and inquiry, each of you agrees to be bound by the "No–Shop" provisions on page 9 of the Term Sheet.

Very truly yours,

GOODWORTH HOLDINGS, INC.

By: _____

Richard K. Ainsworth

President

INTENDING TO BE LEGALLY BOUND, and for good and valuable Consideration, the receipt and sufficiency of which is hereby acknowledge, each of the undersigned has executed this letter, which includes the attached Term Sheet, as of _____, 1999.

_____(SEAL)

DR. M.W. SUH

[and

_____(SEAL)

JOHN NORMAN]

Dated: March ____, 1999

GNG ACQUISITION CORP.

TERM SHEET

Company: [GNG Acquisition Corp.], a [Korean] [corporation] to be formed by the Organizers (the "Company"). The Company will negotiate to finance and acquire the Shares of GNG. The Company shall be engaged solely in the business of acquiring shares of capital stock of GNG (the "Business").

Closing Date: On or before July 31, 1999

Organizers Ownership: Initially, the Company shall be owned [50%] by GoodWorth and [50%] by Suh. [Norman ownership?] It is contemplated that subsequently the Company will undertake equity offerings for the purpose of financing the acquisition of the Shares which will dilute the Organizers' ownership in accordance with their initial ownership of the Company.

Board of Directors: The Organizers shall vote their shares so as to elect seven (7) directors as follows:

(a) three (2) directors designated GoodWorth;

(b) three (2) directors designated by Suh; and

(c) one (1) director selected by agreement of GoodWorth and Suh together.

The initial Board of Directors of the Company shall consist of _____.

Obligations of Suh: Suh will use his best efforts to obtain an agreement from KOPA for the sale to the Company of the Shares, together with all management and other rights associated with the Shares, subject to a financing contingency and an

appropriate due diligence investigation of GNG to the satisfaction of investors who may provide financing for the Company's acquisition of the Shares (the "Investors").

Suh will consult with legal and financial advisors to the Company to develop an appropriate structure for the Company's acquisition of the Shares and to assist such advisors with the description of the Company's plan of business and related matters in connection with presentations to Investors.

Suh will make himself available on a reasonable basis to GoodWorth and the Investors

Obligations of GoodWorth: GoodWorth will use its best efforts to finance the acquisition of the Shares, including without limitation, interviewing and engaging, on behalf of the Company, an investment banking firm to provide advice in connection with the structuring of the acquisition and financing of the Shares and identifying suitable Investors; provided that GoodWorth shall not be obligated to finance the acquisition from any of its own funds.

GoodWorth will consult with legal and financial advisors to the Company to develop an appropriate structure for the Company's acquisition of the Shares and to assist such advisors with related matters in connection with presentations to Investors.

GoodWorth will make its representatives available on a reasonable basis to Suh and KOPA.

Conditions: The Organizers' obligations to proceed with the formation of the Company is conditioned on obtaining a commitment on the part of KOPA to engage in good faith direct discussions regarding the sale of the Shares to the Company, in a form reasonably satisfactory to each of the Organizers' sole satisfaction.

Definitive Agreements: The agreements represented in this Term Sheet shall be reflected in a definitive shareholders' agreement among the Organizers, together with such other terms and conditions and are customary in transactions of this type.

Expiration: The formation of the Company must occur by April 30, 1999 or the Organizers shall have no obligation hereunder.

Costs: Each party shall be responsible for their own costs until such time as the Company shall receive funding; thereafter the parties may receive their out of pocket costs and such fees as shall be negotiated with the Investors.

No Shop: Neither the Organizers, nor any of their owners or officers, shall, for a period of ninety (90) calendar days from the date hereof, seek or respond to any unsolicited offer or proposal for equity financing or any other financing or the sale of any interests in GNG except with or to the Company pursuant to the terms hereof.

## ORDER DENYING PLAINTIFF'S REQUEST TO ALTER OR AMEND THE COURT'S SUMMARY JUDGMENT ORDER

On October 24, 2002, summary judgment was entered in favor of defendants Dr. Suh and JP Morgan Securities, Inc. and against plaintiff. On November 6, 2002, plaintiff filed this request under FRCP 59(e). On November 21, defendants filed an opposition to plaintiff's request. On December 16, 2002, plaintiff filed a request to supplement his FRCP 59(e) motion with newly discovered evidence.

■■■ Reconsideration under FRCP 59(e) is appropriate if the court "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir.1993). Plaintiff raises no claim that there has been an intervening change in the law. His only possible bases for a Rule 59(e) motion are therefore (1) the existence of newly discovered evidence; or (2) clear error or injustice.

No new evidence was presented in plaintiff's initial request. It merely sought an opportunity to obtain new evidence. It disputed the Court's August 2002 denial of plaintiff's eleventh-hour and untimely motion to compel discovery. Plaintiff's motion to compel was not denied because the desired evidence was not likely to be helpful to its case—it was denied because it was inexcusably late. As the August 28, 2002 order stated:

Per Local Rule 26–2, "[n]o motions to compel discovery may be filed more than 10 days after the discovery cut-off." The discovery cut-off in this case was August 2, 2002, pursuant to the Case Management Order of December 6, 2001. Because plaintiff has not provided a viable excuse for this violation, this request is denied.

Plaintiff has not shown that there was an error in that earlier discovery order.

■■■ As noted above, after defendant submitted its opposition to the pending motion, plaintiff filed a supplement advancing new information. This "newly discovered evidence," according to plaintiff, warrants reconsideration of the summary judgment order. To justify reconsideration based on "newly discovered evidence," plaintiff must show "that (1) the evidence was discovered after [the judgment], (2) the exercise of due diligence would not have resulted in the evidence being discovered at an earlier stage and (3) the newly discovered evidence is of such magnitude that production of it earlier would likely have changed the outcome of the case." *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 928–29 (9th Cir.2000).

■■■ Here plaintiff's newly discovered evidence was found after the summary judgment as part of the document production served by H & Q AP in the related case *Goodworth v. H & Q AP*. However, plaintiff has not and cannot sustain item number two. Plaintiff fails to demonstrate that the exercise of due diligence would not have resulted in the evidence being discovered before the judgment. In fact, as the August 2002 order quoted above demonstrated, plaintiff provided no reasonable rationale for why it did not discover the H & Q AP evidence earlier. Accordingly, the summary judgment record in this case was devoid of the new facts and the Court was not entitled to rely upon such. Everyone in this case had a fair chance to make a full and complete record. Plaintiff lost. Now plaintiff would like to relitigate the matter with more facts. That is not the way it works. Having lost, plaintiff may add new facts if it

can meet the strict standards quoted. It has failed to do so. Reconsideration will not be granted on account of this "newly discovered evidence."

\* \* \* \* \* \*

■ Plaintiff also has provided no evidence of clear error or injustice. With regard to Mr. Norman and Mr. Galda's testimony, plaintiff's initial request offers no new facts or arguments. Plaintiff's best argument in its request is that the summary judgment order should not have relied on Mr. Lee's testimony since Dr. Suh failed to identify him in his initial disclosures in January 31, 2002. Plaintiff claims that neither defendant offered any substantial justification for this failure and alleges that it violated FRCP 37(c).

After the cross motions for summary judgment in this case were filed on September 18, 2002, plaintiff filed a Rule 37 motion to exclude evidence on September 23, 2002. The motion was improperly noticed for October 10, 2002, the date of the hearing on the summary judgment motions. The motion was unilaterally shortened to 17 days and required a response by opposing parties 3 days from the date of service of the motion. This was a violation of Local Rules 7–2 and 7–3. Due to these violations, defendants did not file an opposition, but Dr. Suh noted his opposition in his reply brief. Plaintiff did not file a reply.

Plaintiff has not demonstrated clear error with regard to the determination not to entertain its motion. Even assuming, however, that the motion *was* pending on October 10, 2002, plaintiff did not argue its Rule 37 argument at the hearing at all. Significantly, even plaintiff both examined Mr. Lee at his deposition on August 2, 2002, and itself cited to Mr. Lee's deposition transcript in its own summary judgment motion. The disclosure lapse was "harmless" in these circumstances and plaintiff waived his 37(c) argument. Mr. Lee's testimony was properly relied upon by the summary judgment order.

The summary judgment order stands unaltered. Plaintiff's request is **DENIED**.

**IT IS SO ORDERED.**